UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STANLEY H. MILLER,

      Plaintiff,

v.

GENERAL MOTORS LLC,

      Defendant.

Case No. 12-14633
Honorable Laurie J. Michelson
Magistrate Judge Mona K. Majzoub

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
GENERAL MOTORS LLC'S MOTION FOR SUMMARY JUDGMENT [25]**

---

Plaintiff Dr. Stanley Miller, a Caucasian male of European descent, applied to be the Corporate Medical Director of Defendant General Motors LLC ("GM") in 2009. He was not selected. Instead, GM promoted Dr. Patricia Padilla, a Hispanic female born in Columbia. GM says Padilla interviewed better than Miller. About a year later, GM terminated Miller's employment. GM says Miller engaged in a "myriad" of instances of inappropriate conduct. Miller believes that GM's explanations for failing to promote him and for terminating him are a veil for race, sex, or national-origin discrimination. So Miller filed this diversity action under Michigan's Elliott-Larsen Civil Rights Act alleging, primarily, unlawful employment discrimination.

Before the Court is GM's motion for summary judgment on all of Miller's claims. (Dkt. 25, Def.'s Mot. Summ. J.) After careful consideration of the parties' written and oral arguments and thorough review of the record, the Court will grant the motion in part and deny it in part. In particular, a reasonable jury could find that Miller was objectively much more qualified than Padilla to be Corporate Medical Director, but GM nonetheless sought out Padilla to interview for

the position and then placed near dispositive weight on the interviewers' subjective impressions. It would thus not be unreasonable for a jury to conclude that GM was motivated to promote a minority candidate to Corporate Medical Director. While this conclusion might suggest that a reasonable jury could also find that GM terminated Miller in part because of his sex, race, or national origin, the record simply does not permit that conclusion. Instead, the record reflects that after he did not receive the promotion that he fully expected, Miller engaged in a number of questionable acts, including failing to report an Occupational Safety and Health Administration issue to his former peer but subsequent supervisor, Padilla. On this record, Miller cannot meet his burden to show that GM's articulated reasons for termination were a pretext for discrimination.

## I.

Because General Motors moves for summary judgment, the following factual summary is from Miller's perspective. *See Lexicon, Inc. v. Safeco Ins. Co. of Am.*, 436 F.3d 662, 667 (6th Cir. 2006).

## A.

Miller holds a doctorate in osteopathic medicine and is board-certified in occupational environmental medicine. (Def.'s Mot. Ex. 1, Miller Dep. at 14, 21.) "A specialist in occupational and environmental medicine . . . understands workplace illnesses, injuries, and anything associated with the workplace and health by and large . . . ." (Dkt. 27, Pl.'s Resp. to Mot. Summ. J. Ex. 4, Bender Dep. at 8.)

Miller started working for General Motors full time in 1989, first as a plant medical director, then a regional medical director, and by 2002, a group medical director. (Miller Dep. at 19, 24, 32, 39–40; Pl.'s Resp. Ex. 2, Milller CV.) As a group medical director, Miller was

"responsible for all the health services activity for [GM's] global power train and product development" organization, including overseeing the health services provided at several GM plants. (Miller Dep. at 40.)

## B.

Sometime in the summer of 2009, GM's Corporate Medical Director, Dr. Joel Bender, informed his supervisor, GM's Director of Healthcare Janice Uhlig, that he would retire. (Bender Dep. at 82–83; Def.'s Mot. Ex. C, Uhlig Dep at 13–14.) Bender's "number one person" to be his successor was Miller, a preference which he conveyed to Uhlig. (Bender Dep. at 83.)

Along with Miller, GM interviewed two others for the Corporate Medical Director position. One was Dr. Sharon Stewart, an African-American woman. (Miller Dep. at 34–35.) Like Miller, Stewart was a group medical director at the time of Bender's retirement. (Miller Dep. at 34.)

The other candidate was Padilla. After completing medical school in Colombia, Padilla completed a three-year program (similar to a residency in the United States) in occupational medicine. (Padilla Dep. at 7–10.) Padilla started as a contract physician for GM in 1990, became a GM employee in 2000, and, at the time of Bender's retirement, was GM's Senior Medical Director of Latin America, Africa, and Middle East ("LAAM"). (Miller Dep. at 39; Padilla Dep. at 12, 26–28.) Padilla testified that in this role, she managed around 38,000 GM employees in 18 facilities in 12 countries. (Padilla Dep. at 28.) Still, her position was classified by GM as only a non-executive level eight, whereas the group medical director position held by Miller (and Stewart) was an executive position, above level nine. (Padilla Dep. at 42–44; Miller Dep. at 23–24, 32.)

3

Miller testified that he was "surprised" that GM had considered Padilla for the position because "it didn't make sense from objective criteria": she was not an executive, not licensed to practice in the United States, not board-certified, and Bender, Padilla's direct supervisor, felt she was not qualified. (Miller Dep. at 58–59.) Indeed, it was Bender's opinion, which he conveyed to Uhlig, that while Padilla was "a very bright individual" and "up and coming," she needed "more management experience." (Bender Dep. at 60, 62.) Bender further testified that the president of LAAM, the human resources director of LAAM, and certain "HR people" agreed with him that GM "needed to get [Padilla] more direct involvement in managing a larger staff of professionals" before she was ready for the Corporate Medical Director position. (Bender Dep. at 86–87.)

The interviews for the Corporate Medical Director position took place in October 2009. (Def.'s Mot. Ex. E, Pallagi Dep. at 39; Miller Dep. at 92.) By that time, Bender had retired and thus did not participate in the interview process. (Miller Dep. at 43.) Bender testified that he had "expected" to be more involved in selecting his replacement, and that he had asked Uhlig two or three times to discuss his successor, but "[n]o action [was] taken." (Bender Dep. at 85.) According to Miller, Bender told him that Uhlig had delayed the process. (Miller Dep. at 43.) Pallagi, however, testified that "[t]ypically, we wouldn't involve the . . . incumbent" in the interviews. (Pallagi Dep. at 34.)

In addition to Uhlig and Pallagi, two other GM employees served as interviewers: Joe Ponce on GM's labor-relations staff, and Arvin Jones, a manufacturing manager. (Pallagi Dep. at 6–7; Ponce Dep. at 19; Jones Dep. at 6; Miller Dep. at 46–48.) The four interviewed in pairs: Uhlig and Jones as one, Pallagi and Ponce as the other. (*See* Def.'s Mot. at Pg ID 190.) The interviewers asked the candidates the same questions (Uhlig Dep. at 47), and each pair scored the candidates on the same eight categories (*see* Def.'s Mot. at Pg ID 190).

Uhlig and Jones scored Padilla the highest and Miller the lowest. (Def.'s Mot. at Pg ID 190.) Uhlig recalled that after interviewing Miller, she and Jones "talked about [Miller's] communication style even throughout the interview and that it was not crisp and clear. . . . The message was lost in all the words." (Uhlig Dep. at 78.) Jones similarly testified, "There were times when during the process where he was not clear and we would—I do remember we would say okay, can you explain that again. And he did." (Def.'s Mot. Ex. D, Jones Dep. at 76.) Uhlig also recalled that during the interview with Padilla, it came out that she "partnered well with manufacturing, rolled up her sleeves, she got great results in solving a number of the ergonomic issues that they had in the plants." (Uhlig Dep. at 80.) Uhlig thought that Miller was arrogant. (Uhlig Dep. at 83.) Uhlig recalled that she and Jones were "very aligned in our assessments." (Uhlig Dep. at 85.) Although Jones's memory on their scoring was quite foggy, he did testify that "there were occasions where [our numerical scores of the candidates] were close or exact. I don't recollect or recall any issue where . . . one was way left and one was way right." (Jones Dep. at 59.) Uhlig and Jones' joint scores were thirty-two for Padilla and twenty for Miller. (Def.'s Mot. at Pg ID 190.)

Pallagi and Ponce also jointly scored Padilla higher than Miller, but only by two points. (Def.'s Mot. at Pg ID 190.) Pallagi testified: "There was at least one thing that [myself and another manufacturing group person] had tried to work with [Miller], probably, I'm going to say for 18 months leading up to the interview. And that was having his communication be much more concise and to the point." (Pallagi Dep. at 27.) Pallagi recalled that during the interview process Miller was unable to "demonstrate or articulate things that he had personally done to drive any kind of result." (Pallagi Dep. at 60.)

5

Although his memory had faded by the time of his deposition, Ponce was able to recall his post-interview impressions of Miller and Padilla. (*See* Ponce Dep. at 57–59.) "My impression of Dr. Miller was certainly a qualified candidate, and certainly my experience with him was a positive relationship; but my recollection was it almost came across like Dr. Miller was behaving in a way that he just assumed he was going to get the job." (Ponce Dep. at 57.) Still, Ponce did not consider Miller's confidence a negative. (*Id.*) As for Padilla:

> I think it's fair to say the impression I formed was one that provided some very good examples to the questions, and she didn't say anything more than was needed. She did it very succinctly to the process that we kind of look for, the STAR process, which is, you know, the situation, the task, the action the individual took, and the results[,] and I thought she did a very good job of pulling on her experiences to respond to the questions, because, having never met her before, this was my first impression, and I will admit she struck me as someone that was very capable.

(Ponce Dep. at 59.)

After each pair of interviewers jointly scored each candidate, the four interviewers met to discuss who should replace Bender as the Corporate Medical Director. Pallagi recalled, "the take away that I had that day was that clearly, all four interviewers saw Stan [Miller] as the weakest of the three people that were interviewed, and I would say that I was not surprised by that, based on having participated in the selection . . . ." (Pallagi Dep. at 63.) Pallagi remembered: "I think as we discussed [the] concern [over Padilla supervising executives as she had not been an executive before], people felt, based on what she had articulated in the interview process, she clearly was best ready to provide the leadership that group needed." (Pallagi Dep. at 87.)

Padilla began her duties as the Corporate Medical Director in January 2010. (Padilla Dep. at 36–37.) In this new position, Padilla was Miller's supervisor. (Def.'s Mot. Ex. A at Pg ID 189, GM Health Services Org. Chart.)

**C.**

In or around April 2010, Padilla restructured GM's Health Services in a manner that affected Miller. Prior to the reorganization, Dr. Mark Singer, a senior medical director, reported to Miller; after, Singer reported directly to Padilla. (Miller Dep. at 98–99.) In Miller's words, "This was delevelling in many ways for me." (Miller Dep. at 97.) Although this was the "main change" to Miller's role, Miller also testified that prior to the reorganization he and Stewart were co-managing "all of the power train locations," but, after, they were "broken into individual parts." (Miller Dep. at 99.) Indeed, in April, Miller inherited two plants formerly under Stewart's supervision: Fairfax, Kansas, and Lordstown, Ohio. (Miller Dep. at 108–09, 148–49; Jones Dep. at 6.) Neither Miller's pay nor level changed as a result of the reorganization. (Miller Dep. at 106.) But, to Miller, "this organizational rearrangement seemed like it was a demotion in substance." (Miller Dep. at 97.)

As such, Miller sought a meeting with Padilla. (*See* Miller Dep. at 97–106.) At the meeting, Miller expressed "[his] total and objective support" for Padilla. (Miller Dep. at 97, 106.) Miller conveyed to Padilla that he understood why Stewart had been moved, but "[he] hadn't done anything but perform positively and supportively towards [Padilla], so it seemed like there was a difference in treatment between two of us. [Stewart's] for one reason, me for an unknown reason." (Miller Dep. at 105.) According to Miller, "[Padilla] said why don't you think about leaving the company, we don't really need you." (Miller Dep. at 97–98; *see also id.* at 105–06.) Miller was "shocked" and responded that he was "here to support" Padilla, to which Padilla replied, "you are not valued in the manner that you think and you should think about leaving." (Miller Dep. at 98, 106–07.)

**D.**

In the middle of 2010, Padilla reviewed Miller's performance. In a section of the mid-year review labeled "Accountability," Padilla wrote to Miller:

> In the last six months, you have been a poor contributor: In the meetings, where technical decisions have to be taken. There was no proactive participation and/or contribution from you. . . .
>
> In the last six months[,] you have opposed systematically to the proposed activities[,] i.e.[,]
>
> The open resistance to the internal OSHA audit, because in your concept everything was Ok. You expressed having no doubt that your plants were in good shape (when in fact results showed t[ha]t the plants have up to 70% of error rate)[;] . . .
>
> You are always argumentative and defending "old" way to do things. Too controversial to accept changes or new approaches[;] . . .
>
> Resistance to visit the Fairfax plant during the crisis and to be present to support the customer[.] (Instead you went to Lansing, when there plants are not under your responsibility during working days).
>
> You are not setting a good example as a leader. . . .
>
> You tried to charge GM with expenses that are personal (ACOEM Conference in Orlando, Fl . . . the report included days of hotel and other expenses that were not part of the business activity, but of vacation time). . . .

(Def.'s Mot. at Pg ID 196, 198.)

This was Miller's first negative performance review in twenty years at GM. (See Miller Dep. at 133; Padilla Dep. at 166.) At his deposition, Miller provided explanations for most of Padilla's assertions in the mid-year review. Regarding Padilla's claim that Miller resisted the OSHA audit, Miller explained that an audit had just been completed, and, further, the poor-performing plants were those recently reassigned to him from Stewart following the April 2010 reorganization. (Miller Dep. at 147–48.) As for visiting the Fairfax plant, Miller explained that while Padilla had asked him to go to the plant in May 2010, he had already told Padilla that he

was adequately supporting the plant remotely. (Miller Dep. at 110–11.) As for the expense report issue, Miller explained:

> Padilla approved that I was going [to the conference] with my family, she was aware, she approved it. I told her the day I was going to be on vacation. Then the first day of the conference was like a preconference. Padilla saw me [there] at the meeting. . . . I did not pay that first day for tuition because I used to put on these conferences, and so the first day I was going to go to multiple different sessions, so I didn't pay for one session . . . .

(Miller Dep. at 128–29.) He continued, "And so she said because I hadn't paid for the conference that day I violated GM's expense policy to change that date and made me reimburse that date. And then she went back and said I didn't get approval to go with my family." (Miller Dep. at 129.)

After the mid-year review, Miller "met with John Quattrone [in human resources] and reviewed [his] performance evaluation, the false statements that were made, including the expense report fraud, which is obviously a very serious allegation." (Miller Dep. at 152.) Miller recalled, "And John encouraged me to follow the process, work with your leader by formally asking that there be correctness in the evaluation." (Miller Dep. at 152.)

So, in September 2010, Miller sent an email to Padilla regarding his mid-year review. Miller wrote, "I would like to schedule time to meet with you so that we might discuss what changes I feel are essential to make this feedback you have written on me factually accurate in your statements and allegations; have this feedback demonstrate consistency with your evaluations on others; have this feedback given in a way that it integrates the stakeholder feedback, and have feedback that demonstrates fairness and balance." (Def.'s Mot. Summ. J. at Pg ID 200.)

Padilla met with Miller on September 8, 2010. (Miller Dep. at 159–61.) Miller recalled, "She was very angry and upset that we were meeting to review changes. She stated that I'll put

9

you on a performance improvement plan which is an action just short of termination." (Miller Dep. at 160.) Miller further testified, "I was very frightened and scared by those kind of statements from my leader . . . . And she said that she wouldn't make any changes until I change my attitude and again invoked fear in me and was very intimidating with her comments and not at all willing to make changes to any statement on the [performance review]." (Miller Dep. at 160.)

Nonetheless, Miller acknowledged that in late October 2010, and again in early November 2010, Padilla requested via email that Miller provide a summary of his activities during the first half of 2010 to support his request for performance-review revisions. (Miller Dep. at 161.) Miller acknowledged that he did not respond to either request: "I was not understanding what she was asking me for. I had in my [mid-year review] listed accomplishments, listed things that I was doing. So it was—it felt like she was trying to set me up, it felt like I was not—I have already provided information, I wasn't understanding why she wanted me to re-provide the same information. It was confusing as well as intimidating given all the things that she had done." (Miller Dep. at 162.)

### E.

Miller was terminated in significant part due to findings made during an investigation into an Occupational Safety and Health Administration reporting issue. (*See* Def.'s Mot. Ex. G, Richardson Dep. at 99; Def.'s Mot. at 21; Pl.'s Resp. at 21.)

In the late spring or early summer of 2010, Melissa Goddard, the nursing supervisor at the Fairfax plant—a plant for which Miller had health-services oversight responsibility—noticed that the Lordstown plant—a plant for which Singer had health-services oversight responsibility—was reporting significantly fewer injuries to OSHA. (Miller Dep. at 173–76.)

10

This was a concern for Goddard as Fairfax's higher numbers placed her "in a bad light," and because she believed that the health-services staff at Lordstown might have been underreporting to OSHA. (Miller Dep. at 174, 176–78.) So Goddard and Cheng, a physician at the Fairfax plant, brought the issue to Miller's attention. (Miller Dep. at 177–78.)

It is undisputed that Miller did not elevate the issue to Padilla (his and Singer's direct supervisor) and that he told Goddard and Cheng not to raise the issue; but it is also undisputed that Miller brought the issue to Singer's attention "[w]ithin minutes." (Miller Dep. at 176–78, 181.) At his deposition, Miller explained why he handled the situation this way: "[Goddard] was looking at someone else's plant, not her own, and finding this discrepancy. [Lordstown] was not . . . under my jurisdiction . . . . So I said I will take this up, make sure it's addressed, it's a very important thing, I take this seriously, and I will have it addressed . . . ." (Miller Dep. at 177.) He recalled that Goddard was under pressure from leadership at the Fairfax plant regarding the OSHA numbers and that he told Goddard, "I don't want you to address it because you could be perceived in a negative light." (*Id.*) Miller testified, "I was strongly protecting her." (*Id.*) Miller recalled telling Cheng something similar. (Miller Dep. at 178.) Miller also explained, "I felt it would undermine Dr. Singer to make it look like I was going around him who is my peer and who was responsible. And I knew it was being addressed . . . . [I]t was being corrected, the [Lordstown] numbers were going up." (Miller Dep. at 181.) Miller acknowledged that "after many persistent discussions on the same matter" with Goddard and Cheng, he "may" have told them (or at least one of them) that they did not want to become whistle blowers. (Miller Dep. at 178.)

The issue nonetheless came to Padilla's attention in September 2010. That month, Padilla, along with Susan Richardson, a senior human-resources representative in GM's

manufacturing organization, visited the Fairfax plant. (Richardson Dep. at 10–12, 74–75.) In anticipation of Padilla's visit, Miller again told Goddard and Cheng not to raise the OSHA reporting issue with Padilla: "I said let's focus on the positive things you guys have accomplished, our agenda is complete and full, we're going to be reviewing cases about the good record keeping you are doing, let's not have that be a distraction and talk about another plant's problems, let's focus on the visit and leave her with a positive impression." (Miller Dep. at 180.) Even so, "Dr. Cheng and Melissa Goddard asked to speak with [Richardson] and Dr. Padilla privately, and at that time they shared concerns with the OSHA recordables." (Richardson Dep. at 75.)

This triggered an investigation by three individuals: Donna Fulton from GM's Global Investigations, Michael Bartolac from GM's Risk Management & Special Investigations, and Richardson. (Richardson Dep. at 75; Def.'s Mot. at Pg ID 251.)

The results of Richardson's investigation are reflected in her notes and in a chart she prepared linking her findings with certain GM metrics. Regarding the OSHA issue, Richardson noted that Cheng thought Miller had given him a "gag order." (Richardson Dep. at 105–06; Richardson Investigation Notes at Pg ID 247, 255–56.) She wrote that, according to Hughes, Miller had told her to "be quiet." (Richardson Investigation Notes at Pg ID 254.) According to Richardson's notes, Goddard recalled an October 14, 2010 conference call where Miller said not to raise the issue, specifically telling Goddard, "Melissa you understand what I am saying?" (Richardson Investigation Notes at Pg ID 256.) Richardson further wrote: "During [a November 2010] interview with M. Bartolac and D. Fulton[,] . . . Dr. Miller stated repeatedly that he was not responsible or accountable for reporting incorrect data to his leadership. During same

12

interview Miller acknowledged that incorrect data issues were brought to his attention in mid August." (Richardson Investigation Notes at Pg ID 247.)

In a March 2011 report (completed after Miller's termination in December 2010), Bartolac wrote, "Miller said he brought it to the attention of Singer because Singer had responsibility for Lordstown Medical. Miller said he believed Singer took the matter to the Divisional Safety Manager . . . to be resolved." (Pl.'s Resp. at 793.) Bartolac concluded, "Although there was some questionable communications on the part of Miller when the issue was first brought to his attention, there is insufficient evidence of intentional wrongdoing or concealment on his part." (Pl.'s Resp. at Pg ID 794.) When asked about this statement at her deposition, Richardson, who had not previously seen Bartolac's report, said, "I vehemently disagree with that." (Richardson Dep. at 119.)

The notes from Richardson's investigation also include findings about Miller's job performance and behavior more generally. For instance, she noted that Miller had not responded to Padilla's emails to summarize his activities so that his mid-year review could be reassessed. (Richardson Investigation Notes at Pg ID 246.) She also noted the expense-report issue discussed above. (Richardson Investigation Notes at Pg ID 247.) Richardson wrote that Miller failed to show respect for Padilla and she provided examples, including that Padilla had recommended an improvement when she visited Fairfax, with Miller subsequently telling Goddard "not to do it." (Richardson Investigation Notes at Pg ID 249.) Richardson also wrote that Miller clipped his nails and spent time flipping through his planner instead of paying attention during meetings. (*Id.*)

In Richardson's opinion, Miller was sometimes "pleasant," but also "arrogant, evasive, dismissive." (Richardson Dep. at 36.)

**F.**

In December 2010, GM terminated Miller's employment. Although Jean Rose, then GM's Director of Health Services and Padilla's supervisor, was the primary decisionmaker, she had input from a number of sources. (*See* Def.'s Mot. Ex. H, Rose Dep. at 43–44, 76.) She talked with Padilla, who recommended that Miller be terminated. (Rose Dep. at 44.) She also reviewed the mid-year review prepared by Padilla. (Rose Dep. at 43.) She had discussions with Richardson and GM's HR Director, John Diewald. (Rose Dep. at 62.) Rose reviewed Richardson's investigation notes. (Rose Dep. at 41–43.) Rose did not look at Miller's stakeholder feedback, (Rose Dep. at 70)—which contained positive statements about Miller's performance and abilities. Nor did Rose interview Miller. (Rose Dep. at 70.)

In addition to Padilla and Richardson's input, Rose also had some personal knowledge of Miller. She recalled, "I didn't have much interaction with Dr. Miller, but I found him not able to articulate what he was working on or—and even a direct question to be able to answer in a clear and concise way." (Rose Dep. at 46; *see also id.* at 58.) Rose also recalled a project that she assigned to Miller via Padilla. (Rose Dep. at 48–49.) When Rose met with Miller on the project, "[h]e presented me with three or four pages of Power Point. It was a very high level plan. . . . [The presentation] [w]asn't complete, wasn't clear, didn't understand what he had put together, wasn't sure where we were going, didn't have a lot of facts." (Rose Dep. at 54.) Rose "wasn't impressed." (*Id.*)

In January 2011, Rose, Padilla, and HR Director Diewald met with Miller to inform him of his termination. Miller recalled the meeting this way:

> I was obviously shocked. I had been a top performer in an outstanding career, successful until Dr. Padilla came in to her role. I asked why. They said you are no longer a good fit, you are not a good fit. And I asked what has changed. I had been obviously a very good fit for over 20 years. They said . . . this decision is

> final, you can't get it reversed by anyone . . . . I said I just recently submitted my [year-end performance-review] with detailed information of all the significant accomplishments that I have made in the year, objective evidence of my outstanding performance. And they said this is not a performance issue directly.

(Miller Dep. at 201.)

### G.

Although testimony on this point was not unequivocal, it appears that Miller's responsibilities were redistributed among several doctors, one of whom was a Caucasian male. (*See* Padilla Dep. at 66–67; Richardson Dep. at 16.)

In January 2013, Rose moved Padilla from the Corporate Medical Director position to a regional medical director position—but with the additional responsibility of OSHA compliance for GM globally. (Rose Dep. at 10–11.) GM filled the Corporate Medical Director vacancy by hiring Dr. Jeff Hess, a Caucasian male. (Uhlig Dep. at 111–12.) Uhlig and Rose were both members of the four-person panel who interviewed Hess. (Uhlig Dep. at 111.)

### H.

In October 2012, Miller filed a three-count complaint in this District. Count I asserts that GM violated Michigan's Elliott-Larsen Civil Rights Act because sex was a factor "in Defendant's decision to subject him to the wrongful and discriminatory treatment, including failure to promote, a hostile environment based on his sex, harassment, unwarranted discipline, termination and/or other disparate treatment." (Compl. ¶ 28.) Count II is essentially the same as Count I, save that the protected characteristic is "race and/or national origin." (Compl. ¶ 37.) Count III is a claim of retaliation under the ELCRA. (*See* Compl. ¶ 47.)

In May 2014, GM moved for summary judgment on all counts. (Dkt. 25, Def.'s Mot. for Summ. J.)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-movant, here Miller. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

### A.

GM first argues that no reasonable jury could find that Miller's race, sex, or national origin was a motivating factor in its decision to promote Padilla instead of Miller to the Corporate Medical Director position. (Def.'s Mot. at 15–18.) The issue is a close one, but the Court disagrees with GM.

"Absent direct evidence of discrimination, claims brought pursuant to . . . the Elliot[t]-Larsen Act are subject to the tripartite burden-shifting framework first announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and subsequently modified in *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). GM's opening brief, by immediately proceeding under the *McDonnell Douglas* burden-shifting framework, assumes the absence of direct evidence; Miller has not challenged GM's assumption and also proceeds under the three-step framework. (*See* Def.'s Mot. at 15–18; Pl.'s Resp. at 15–16.)

Following the parties' lead, the Court finds that Miller's discriminatory-failure-to-promote theory is based only on circumstantial evidence, and *McDonnell Douglas* applies. Under

16

that framework, Miller must first make out a prima facie case of discrimination; if he does so, GM must articulate a legitimate, non-discriminatory reason for its employment decision; and, if GM does so, Miller must demonstrate that GM's rationale is merely a pretext for discrimination. *See Sniecinski v. Blue Cross & Blue Shield of Michigan*, 666 N.W.2d 186, 193 (Mich. 2003).

**1.**

Although Miller has the initial burden of establishing a *prima facie* case of discrimination, GM does not assert that Miller cannot carry this burden; GM instead begins its argument by asserting that it had "legitimate, non-discriminatory reasons for selecting Dr. Padilla over [Dr. Miller] for the [Corporate Medical Director] position." (*See* Def.'s Mot. at 15–16.) Like GM, the Court will assume that Miller can establish a *prima facie* case of sex, race, and national origin discrimination.

**2.**

The burden thus shifts to GM to articulate a legitimate, non-discriminatory reason for not promoting Miller to the Corporate Medical Director position. GM articulates this reason: "In addition to the opinions of the interviewers based on prior interaction with the candidates, Dr. Padilla simply interviewed better than [Dr. Miller], as reflected in the scores assessed." (Def.'s Mot. at 16.) The evidence cited by GM sufficiently supports this assertion. (*See* Def.'s Mot. at 2–8.) The four interviewers who determined Bender's replacement asked the candidates the same questions, and scored the candidates on the same metrics. They worked in independent pairs, each pair scoring Padilla higher than Miller. At least three of the interviewers (Uhlig, Pallagi, and Jones) thought that Miller had difficulty communicating clearly and succinctly, either during the interview or on other occasions. One of the interviewers (Uhlig) thought that Miller was arrogant. As for Padilla, another interviewer (Ponce) recalled that she "did a very good job of

pulling on her experiences to respond to the questions," and, having not met Padilla before, she "struck [him] as someone that was very capable." In view of this evidence, and given that Miller makes no counter-argument regarding this second step of the *McDonnell Douglas* framework (*see* Pl.'s Resp. at 16), a reasonable jury could find that GM's explanation—that Padilla was chosen over Miller based on their interviews and the interviewers' prior interactions with the candidates—to be a legitimate, non-discriminatory reason for promoting Padilla over Miller.

**3.**

Thus, the "presumption of discrimination created by plaintiff's prima facie case drop[s] away," and Miller must establish that a reasonable jury could find that GM's articulated reason was a pretext to discount Miller for the promotion because of his sex, race, or national origin. *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 522, 526 (Mich. 2001).

To reach a jury on a discrimination claim under the Elliott Larsen Civil Rights Act, "a plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual," but must also show "that it was a pretext for [unlawful] discrimination." *Hazle*, 628 N.W.2d at 522; *Movsisyan v. IPAX Cleanogel, Inc.*, No. 299235, 2013 WL 2494979, at *7 (Mich. Ct. App. June 11, 2013) ("The dual burden that a plaintiff alleging discrimination has once an employer produces evidence of a nondiscriminatory reason for its action is to create an issue of fact that (1) the proffered reason is either false or not the real or only reason for the action and that (2) a motivating factor for the action was unlawful discrimination."); *Brintley v. St. Mary Mercy Hosp.*, 904 F. Supp. 2d 699, 730 (E.D. Mich. 2012) ("Michigan's law regarding pretext law differs from federal law . . . in that it requires 'pretext plus.'").

Although this standard is simply stated, it is challenging to apply in cases where an employee has demonstrated that a reasonable jury could find that his employer's articulated

reason for the adverse employment action is false. *Cf. Lytle v. Malady*, 579 N.W.2d 906, 915 (Mich. 1998) (Weaver, J.) ("This Court has struggled to define the requisite standard of proof sufficient to survive summary disposition of a discrimination claim under [the burden-shifting] framework, particularly with respect to the third stage of proof."). Although the language quoted above seems to unequivocally require an employee to demonstrate more than mere falsity, a majority of the Michigan Supreme Court has stated that a showing of pretext (together with the prima facie case), is sufficient to survive summary judgment in some cases:

> [A] plaintiff will not *always* present a triable issue of fact merely by rebutting the employer's stated reason(s); "put differently, that there may be a triable question of *falsity* does not necessarily mean that there is a triable question of discrimination." Furthermore, we note that in accordance with nine other federal circuits, "evidence sufficient to discredit a defendant's proffered nondiscriminatory reasons for its actions, taken together with the plaintiff's prima facie case, [may be] sufficient to support (but not require) a finding of discrimination."

*Town v. Michigan Bell Tel. Co.*, 568 N.W.2d 64, 69 (Mich. 1997) (Brickley, J.) (citations omitted); *Lytle*, 579 N.W.2d at 915 & n.22 (Weaver, J.) (adhering, in Part III(A) of her opinion, to the position taken by a "majority of this Court" in *Town*); *Lytle*, 579 N.W.2d at 920 (Mallett, C.J.) ("I am in agreement with . . . [Part] III(A) . . . of [Justice Weaver's] opinion.").

The language of *Town*, *Lytle*, and *Hazle* supports that, under the ELCRA, if an employee makes a very strong showing that his employer's articulated reasons for the adverse employment action were false, an employee may need to produce little additional evidence of discrimination to satisfy his burden at the third step of the *McDonnell Douglas* burden-shifting framework. *Cf. Hazle*, 628 N.W.2d at 522 ("[A] plaintiff need only create a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor in the employer's decision."); *Towne*, 568 N.W.2d at 70 (concluding that plaintiff "did not submit

19

evidence of pretext sufficient to enable a reasonable factfinder to infer that the employer's decision had a discriminatory basis").

Here, Miller has presented a strong case that GM promoted Padilla not because "Dr. Padilla simply interviewed better than [Dr. Miller]" (Def.'s Mot. at 16). And Miller has produced enough other evidence that sex, race, or national origin was a factor in GM's decision to promote Padilla that his discriminatory-failure-to-promote claim should proceed to a jury.

More specifically, the Court agrees with Miller that a reasonable jury could find that Padilla was "objectively unqualified" for the Corporate Medical Director position. (Pl.'s Resp. at 16.) Bender testified that he told Uhlig in annual succession-planning meetings that a Corporate Medical Director needed to have "professional involvement," "board certification," and knowledge "of multiple facilities and running larger organizations" and of OSHA recordables. (Bender Dep. at 90.) Regarding board certification specifically, Bender testified:

> Q. Board certification, would you have told anyone that that was a desired but not necessary qualification?
>
> A. No.
>
> Q. For corporate medical director?
>
> A. I would not have said that.
>
> Q. Because you believe otherwise?
>
> A. That's correct.

(Bender Dep. at 94.) And Bender explained why he thought board certification was necessary to be GM's Corporate Medical Director:

> [A]s I recall and even for other positions that we advertised for, board certification was always a primary consideration, and it would tend to override any other kind of medical education or continuing education individuals might have had. . . . It was desirable because of the complexities within the General Motors structure and automotive sector and because of the content of the position

20

of corporate medical director. You really didn't—*you couldn't have the expertise unless you had this kind of certification*.

* * *

If you are in the United States, you want to have somebody that's board certified because of credibility for one thing. If you are in speaking engagements and so forth, that's what you want to do. It is really—the time that I was in this field, *it was really an exception for somebody not to be board certified*.

(Bender Dep. at 18, 94 (emphases added).) Further, Miller testified that at "Fortune 50 companies in the United States . . . medical licensure and board certification is clearly the standard." (Miller Dep. at 59.) And the record suggests that of GM's last four Corporate Medical Directors, only Padilla was without board certification. (Miller Dep. at 58–59; Rose Dep. at 84.)

GM responds that "board certification was not a required qualification [for the Corporate Medical Director] position, as evidenced by the testimony of the individuals who sat on the interview panel and GM documents reflecting the roles and responsibilities of the corporate medical director position." (Dkt. 30, Def.'s Reply at 2; *see also* Def.'s Mot. at 3, 5, 17.) A reasonable jury could disagree with GM.

As an initial matter, the job description GM relies upon is not dispositive. True, the document, titled "Corporate Medical Director Roles and Responsibilities Leadership Profile," states that board certification in occupational and environmental medicine is merely "preferred." (Def.'s Mot. at Pg ID 296, 298.) But the document is not dated. (*See id.*) There is some suggestion that it was the job description for Bender's 2002 interview that he emailed to Uhlig in October 2009. (*See* Pallagi Dep. at 66–67.) And the four interviewers were far from certain that it was part of the interview materials. Uhlig testified that she did not recall the document being part of the materials, but instead said that it was "something Dr. Bender would have had." (Uhlig Dep. at 58.) Jones similarly testified, "I can't recall specifically if this [document] was exactly it,

21

but we were given prior knowledge as to what the job entailed." (Jones Dep. at 51.) Pallagi said that the document "may have been provided to each of the interviewers, probably." (Pallagi Dep. at 67.) Ponce stated that he did not recall seeing the document in preparation for the interview process. (Ponce Dep. at 9.) On this record, a jury could infer that the job-description document produced by GM did not set forth the requirements for the Corporate Medical Director position when Miller and Padilla interviewed for the job.

As for the interviewers' testimony, GM is correct that Uhlig said that she and Pallagi thought that board certification was not necessary for the Corporate Medical Director position because they "were more looking for a leader of the organization." (Uhlig Dep. at 61.) Even Miller concedes, "The majority of the [Corporate Medical Director] job clearly is administrative." (Miller. Dep. at 60.) But this testimony does not demonstrate as a matter of law that board certification was not a necessary qualification to serve as GM's Corporate Medical Director. It merely creates a conflict, with Bender's and Miller's contrary testimony, that a jury could resolve in Miller's favor.

And even if a reasonable jury could only find that board certification was an important, but not necessary, credential, the record would still permit it to find that Miller was, based on objective criteria, significantly more qualified than Padilla. *See Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006). To be sure, some of the interviewers thought that Miller had difficulty communicating succinctly. At least one thought him arrogant. And some found that Padilla gave strong answers to the interview questions. And no one disputes that Padilla was herself highly credentialed. But Padilla was not an executive; Miller was. Padilla was not licensed to practice medicine in the United States; Miller was. Padilla was not board-certified;

Miller was. And Bender made clear that he thought Miller was the best person for the job. As for

Padilla, Bender opined,

> With the position that she had in Latin America, Africa, Middle East, she basically ran a plant, and then outside that it was all more influential type management style that she had. So we needed to broaden that perspective for her and see how she would directly deal with professionals that were very strong individuals in an area in which she might not have had expertise.

(Bender Dep. at 61.) It would also not be improper for a reasonable jury to consider (while

mindful that hindsight is 20/20) that Padilla was removed from the Corporate Medical Director

position in less than three years, and Rose explained that this was in part because Padilla lacked

experience at the executive level. (Rose Dep. at 10–11, 15–16.) On this record, there would be

nothing unreasonable about a jury finding that Miller was significantly more qualified than

Padilla to be GM's Corporate Medical Director.

It follows from these findings (i.e., that a reasonable jury could find either that board

certification was a prerequisite to becoming GM's Corporate Medical Director or that, based on

objective criteria, Miller was significantly more qualified for the position) that a reasonable jury

could seriously question why GM would place dispositive weight on subjective criteria, i.e., who

interviewed better. And a jury could answer that question by concluding that GM did not in fact

do so.

Of course, this showing of pretext does not necessarily mean that a jury could find that

GM's explanation is to cover up a discriminatory motive. *See Lytle*, 579 N.W.2d at 915 n.22

(Weaver, J.) ("[E]vidence sufficient to discredit a defendant's proffered nondiscriminatory

reasons for its actions, taken together with the plaintiff's prima facie case, [*may be*] sufficient

support but not require a finding of discrimination." (second alteration in original, emphasis

added)); *Bender*, 455 F.3d at 627 ("If a factfinder can conclude that a reasonable employer

would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, *such as* discrimination, enters into the picture." (emphasis added) (internal quotation marks omitted)). But here, Miller has produced just enough additional evidence to permit a reasonable jury to reach that conclusion.

In particular, a reasonable jury could find it significant that GM sought out an additional minority candidate for the Corporate Medical Director position. True, Pallagi testified that "[Padilla's] name was surfaced just like [Miller's] was and just like Dr. Stewart's was. That we felt those were the only three viable candidates to be considered for the position and all three would be interviewed for the position." (Pallagi Dep. at 25.) But it remains that Padilla did not apply for the Corporate Medical Director position. (Padilla Dep. at 40–41.) Indeed, she was not even aware of the position until Pallagi contacted her about it—just a few days before the interview. (Padilla Dep. at 40–41; *see also* Miller Dep. at 57.) By that time, Miller, an objectively qualified person, was already in the candidate pool (*see* Miller Dep. at 41), and so a jury could question why GM sought out a much less qualified person to be its Corporate Medical Director. A reasonable conclusion would be that GM wanted a minority candidate, instead of a Caucasian male, to be in the position. Lending support to this inference is that Bender recalled, "when we would be looking at promotions within health services or appointing somebody as a senior physician, HR always would [look at gender and race]. I think it's in their blood. . . . They would say well, you haven't appointed or this area hasn't had someone of this race or gender, they might give me some statistics about certain plans or whatever." (Bender Dep. at 73.) And Miller similarly testified, "different treatment was obvious to minorities and others throughout

my career and there was encouragement to try to bring in minorities and others that were not—minorities, and I was actively supportive of that." (Miller Dep. at 28.) Finally, the fact that Stewart was already one of the two candidates for the Corporate Medical Director position does not make it unreasonable for a jury to infer that GM solicited Padilla to increase the likelihood that a minority candidate would be selected. And, based on Stewart's behavior, performance, or conduct discussed below, a jury could infer that GM had reservations about whether Stewart would be a strong candidate in the interviewers' eyes.

* * *

In short, whether a reasonable jury could find that Miller was not promoted in part because of protected characteristics is a close question. On the one hand, GM has evidence that two independent pairs of interviewers each thought that Padilla interviewed better than Miller. On the other hand, Miller has produced evidence permitting a jury to find that, based on objective criteria, Padilla was not qualified for the Corporate Medical Director position or, at least, that Miller was significantly more qualified than Padilla for the job. And this would permit a jury to question GM's reasons for soliciting a Hispanic female to apply for that role. It would not be unreasonable for a jury to answer that inquiry by concluding that GM did so because it wanted a minority as its Corporate Medical Director. As such, it is for a jury to decide whether sex, race, and/or national origin was a motivating factor in GM's decision not to promote Miller.

**B.**

Miller also complains that GM, primarily Rose and Padilla, terminated him at least in part because of his sex, race, or national origin, in violation of the Elliott-Larsen Civil Rights Act. (*See* Compl. ¶¶ 31, 40.) GM moves for summary judgment on this discriminatory-termination claim. (Def.'s Mot. at 18–22.) Miller does not proceed on a direct-evidence theory, (*see* Pl.'s

25

Resp. at 19–22), so the burden-shifting framework of *McDonnell Douglas* again applies. *Baxter*, 533 F.3d at 391. GM says it had a number of legitimate, non-discriminatory reasons for terminating Miller. The issue is again close, but the Court agrees with GM that no reasonable jury could find that it terminated Miller because of his sex, race, or national origin.

## 1.

In addition to claiming that Miller cannot demonstrate that its reasons for termination are a pretext for discrimination, GM argues that Miller cannot establish an element of his *prima facie* case. (Def.'s Mot. at 18–19.) Specifically, GM asserts that Miller cannot identify any similarly-situated employee whom GM treated better. (Def.'s Mot. at 18–19.) GM's position is supported by *Martinez v. Cracker Barrel Old Country Store, Inc.*, in which the Sixth Circuit said, "for purposes of analysis under the ELCRA, [Plaintiff] makes a prima facie showing if she demonstrates that she was qualified for the position, suffered an adverse action, *and was treated differently than a similarly situated non-Caucasian*." 703 F.3d 911, 915 (6th Cir. 2013) (emphasis added).

Miller says that he does not need to identify a similarly-situated employee to establish a prima facie case. (Pl.'s Resp. at 19–20.) He relies on *Lytle v. Malady*, which sets out the elements of a *prima facie* case this way: "(1) [the employee] was a member of the protected class; (2) [he] suffered an adverse employment action . . . ; (3) [he] was qualified for the position; but (4) *[he] was discharged under circumstances that give rise to an inference of unlawful discrimination*." 579 N.W.2d 906, 915 (Mich. 1998) (Weaver, J.) (emphasis added); *accord Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 523 (Mich. 2001).

26

The Court need not reconcile these different articulations of an employee's *prima facie* case of discrimination under the ELCRA because the Court agrees with GM that Miller cannot demonstrate that GM's reasons for terminating Miller were a pretext for discrimination. So, as before, the Court will presume that Miller has established a *prima facie* case of discrimination.

**2.**

GM claims to have terminated Miller for conduct-related reasons. In particular, it says,

> GM conducted an investigation and concluded plaintiff did in fact instruct two subordinates not to report concerns about potential safety violations up the chain (a directive plaintiff has indeed admitted giving), along with a myriad of other instances of conduct that it found inappropriate, including failing to provide full and complete information regarding the hiring of a contract physician and disrespectful behavior toward his supervisor.

(Def.'s Mot. at 22; *see also* Def.'s Reply at 4 ("Perhaps most significantly, plaintiff admittedly directed two subordinates not to raise concerns about potential OSHA reporting violations, and his convoluted attempt to rationalize his basis for doing so does not alter GM's conclusion that his actions were wholly improper.").)

The evidence cited by GM permits a reasonable jury to find that GM's articulated reason for firing Miller was legitimate and non-discriminatory. (*See* Def.'s Mot. at 12–14, 20–21.) Rose provided that the notes Richardson generated from her investigation served as "background documentation to evaluate to determine whether or not we would terminate him." (Rose Dep. at 42.) Rose also testified to "so many numerous performance issues that came on Stan Miller. His administrative duties that were not getting done, his inability to understand the corporate systems they used for reporting, his treatment of staff in the plants, his [in]ability to follow policy on hiring, his talking about Dr. Padilla in a derogatory manner, his disrespectfulness." (Rose Dep. at 34.) Padilla testified that Miller was fired because "[h]e had not a good performance and not a good attitude, . . . he was disrespectful, he was not engaged in trying to be part of the team,

challenging the decisions that we were making as a team in the [human resources meetings]." (Padilla Dep. at 90.) In all, Padilla's and Rose's testimony permits GM to discharge its burden under the *McDonnell Douglas* framework and to shift the burden back to Miller to show that its articulated reason was a pretext for discrimination.[1]

### 3.

Miller attempts to show that all, or virtually all, of the many allegations of inappropriate conduct set forth in Padilla's mid-year review and Richardson's investigation summary are false or mostly false. (Pl.'s Resp. at 6–15, 19–23.) But Miller has not succeeded with regard to at least two significant reasons GM has given for his termination.

Perhaps most significant was Miller's handling of the OSHA recordables issue raised by Goddard and Cheng. (*See* Def.'s Reply at 4.) From Miller's perspective, he properly handled the issue by immediately raising it with Singer, the person responsible for health services at Lordstown and someone who worked directly under Padilla. (Miller Dep. at 176–78, 181.) And a jury could agree with Miller that he proceeded this way in Goddard's, Cheng's, and Singer's interests. (Miller Dep. at 177–78, 181.) But Miller's intent, even if deemed noble, does not change the undisputed facts that he did not elevate the issue to Padilla and explicitly directed Goddard and Cheng not to do so despite their repeated requests. The Court does not believe that a reasonable jury would find it improper for GM to terminate an employee who prevented subordinate employees from reporting what they believed to be a serious OSHA issue. Indeed,

---

[1] Padilla testified that she learned, apparently in connection with the investigation into the OSHA recordables issue at Lordstown, that Miller had directed the group medical director for the Fairfax plant, Cheng, not to prescribe medication to patients so as to avoid OSHA reporting. (*See* Padilla Dep. at 88–90.) Although neither party discussed this testimony in their briefs or mentioned it at oral argument, Padilla's testimony indicates that she thought this was a reason for Miller's termination, and the Court finds it adds weight to GM's position that Miller was not terminated for unlawful reasons.

when Miller was asked at his deposition if, "in hindsight," he would have handled the situation

differently, or if he had concerns about how he handled the situation, Miller responded:

> It generated a full audit, so obviously that was very time consuming and negative for a lot of people involved having to go through that. I wish they [Goddard and Cheng] would have had more confidence that I was going to take care of it. And perhaps—I didn't want to tell them I was having Dr. Singer, I didn't want to tell names to them. But perhaps if I would have told them that—I told them it was being addressed, they could see the reports and see that it was being addressed. So I would think that that would have really had them understand that it was factual, that they didn't have reason for concern. But clearly they didn't because they kept expressing concern. And I think it was because of the pressure they were under at Fairfax.

(Miller Dep. at 182.)

Miller stresses that Bartolac, one of the three investigators into the issue, wrote a report

exonerating him. (Pl.'s Resp. at 11, 21.) Not quite. Bartolac did conclude that there "was no clear

written policy in place" requiring plants to report all of their OSHA recordables. (Pl.'s Resp. Ex.

22, at Pg ID 794.) But he only found "insufficient evidence" of "intentional" wrongdoing or

concealment on Miller's part while noting that some of Miller's initial communications were

"questionable." (*Id.*) Indeed, Miller testified that during the audit meeting with Richardson and

Bartolac, "the tone of the . . . meeting even after I showed them [the dramatic improvement at

Lordstown] was very negative towards me and I felt like I was being set up. So my conclusion is

that [the meeting] was negative." (Miller Dep. at 183.) And, in all events, it is undisputed that

Miller was terminated in January 2011 while Bartolac's report is dated March 2011. Bartolac's

report thus does little to permit a jury to find that the OSHA recordables issue was pretextual.

Second, Miller has not shown that GM falsely claimed that it terminated him in part

because he "fail[ed] to provide full and complete information regarding the hiring of a contract

physician" (Def.'s Mot. at 21). Miller testified that Richardson specifically asked whether a

contract physician had been "added" at the Fairfax plant, and, because the new physician had

29

simply taken over Cheng's contract position (when Cheng became a GM employee), he answered "no" to Richardson's question. (Miller Dep. at 186.) Miller's answer was technically accurate, but not "full and complete." No reasonable jury would find GM's reaction to Miller's semantics to be motivated by discriminatory animus.

Moreover, it appears that the real issue was how Miller and Cheng solicited the new physician. (*See* Padilla Dep. at 82–83.) Although Miller implies he went through the proper process, (Pl.'s Resp. at 11–12), the emails he attaches in support are to the contrary. After Cheng sent an email to Jay Manor in GM's human resources department asking if Manor had seen Miller's email supporting the potential hire, Manor responded in an email to Cheng, Miller, and Padilla as follows:

> No, I have not seen it. Regardless, you do not have the authority to contract for GM. This process is to run background/drug checks, acceptance of terms and conditions, acceptance of financial offer, and executing contracts.
>
> All the above is the responsibility of Health Services and Purchasing. Please cease your activities regarding this matter until we can sort this out.

(Pl.'s Resp. Ex. 23 at Pg ID 797.)

In short, GM has given two significant reasons for terminating Miller's employment. And Miller has not produced enough evidence for a reasonable jury to find that GM provided these reasons to mask sex, race, or national-origin bias. Summary judgment in favor of GM is thus warranted.

Further, Miller has failed to show the "plus" element of pretext under the ELCRA. *See Lytle*, 579 N.W.2d at 915–16 (Weaver, J.); *Lytle*, 579 N.W.2d at 920 (Mallett, C.J.); *Hazle*, 628 N.W.2d at 522; *Movsisyan*, 2013 WL 2494979, at \*7. Miller's primary basis for showing that GM engaged in unlawful discrimination in deciding to terminate him is GM's "significantly better" treatment of Stewart—a group medical director directly under Padilla's supervision, but,

unlike Miller, an African-American female. (Pl.'s Resp. at 14, 20–21.) No reasonable jury would be persuaded.

Miller points to differences in how GM handled his and Stewart's behavioral issues. (Pl.'s Resp. at 20–21.) According to Miller, "[B]oth [Dr. Singer and I] had seen Dr. Stewart's behavior and how inappropriate it was, how negative it was, and Dr. Padilla refused to address it and correct it. And Dr. Singer's comments to me were if we had conducted ourselves in that manner we would be held to a different standard than Dr. Stewart is held to because of her race and sex." (Miller Dep. at 218.) But Miller testified to only a single incident involving Stewart to which Padilla was privy. At Padilla's very first meeting with the Health Services leadership group—before she had even officially started as Corporate Medical Director (Padilla Dep. at 37)—she witnessed Stewart shouting at Miller. (Miller Dep. at 138.) But Padilla acknowledged Stewart's conduct: at lunch the next day she told Miller, "[']I can see that Dr. Stewart is the problem.[']" (Miller Dep. at 138.) Miller does not cite further instances of inappropriate behavior by Stewart that Padilla knew of yet ignored. (*See* Pl.'s Resp. at 7, 20–21.) Miller does point out that Pallagi knew of Stewart's behavioral issues; but Pallagi told Miller that "he would work to try to help improve those so that we could have a cohesive team working together. And he also said that [Stewart] went through a divorce and just has a couple years left to work to retirement and try to help her get to that point." (Miller Dep. at 138.) Miller also testified that Bender "told me that [Stewart] had behavioral issues and conduct issues." (Miller Dep. at 138.) But Miller does not help a putative jury understand this vague statement: he cites no evidence of the conduct to which Bender referred, of Bender conveying his concerns to Padilla, or of Padilla's response to those concerns.

31

Miller also implies that GM ignored Stewart's performance (which was allegedly poor) while scrutinizing his. (*See* Pl.'s Resp. at 8, 14, 20.) At his deposition, Miller recalled Singer remarking that "Dr. Stewart had these plants that were having extraordinarily high negative audit results compared to our power train plants that [Singer] and I had. And that seemed to not matter, to not be held to account, and yet she [Padilla?] was making negative comments to me that [Singer] saw regarding OSHA record keeping . . . ." (Miller Dep. at 218.) It appears that Miller was referring at least in part the mid-year performance reviews. (*See* Pl.'s Resp. at 8–9.) But on the one page of Stewart's review that Miller has provided, Stewart wrote (among other things), "I have worked extensively in retraining my groups on OSHA recordkeeping and the meaning of accountability," with Padilla responding in part, "Sharon, I completely agree with your comments." (*Id.*) As for the other side of the coin—Miller's claim that Singer witnessed Padilla make "negative comments" about how their plants were performing—Miller provides no details or context for this vague assertion. Miller does assert that, in his mid-year review, Padilla "accused him of a 70% error rate in reporting workplace injuries," which was inaccurate as those plants had been Stewart's until a few months before the review. (Pl.'s Resp. at 8.) But, in fact, Miller's mid-year review said that Miller had openly expressed "resistance to the internal OSHA audit" because he had "no doubt that [his] plants were in good shape (when in fact results showed t[ha]t the plants have up to 70% of error rate)." (Def.'s Mot. at Pg ID 198.) This is a critique of Miller's resistance to the audit process—not of the performance of the plants he had just inherited from Stewart.

Miller further argues that other aspects of his mid-year performance review, especially when compared to Stewart's, indicate that Padilla considered his sex, race, or national origin in making her findings. According to Miller, Padilla's review failed to account for his positive

32

stakeholder feedback and accused him of "a host of subjective and unverifiable performance deficiencies including 'poor contributor', 'impeding progress', and a 'defiance attitude.'" (Pl.'s Resp. at 8–9.) In contrast, says Miller, "Dr. Stewart received a positive 2010 review despite her alleged April demotion," with Padilla "laud[ing]" Stewart's integrity and managerial courage. (*Id.*)

But given a more complete picture, no reasonable jury could infer sex, race, or national-origin discrimination from these differences. Beginning with Stewart's mid-year review, it appears that Miller faults Padilla for "laud[ing]" Stewart's integrity although Stewart had been found to have wrongly approved certain fuel-reimbursement requests. (*See* Miller Dep. at 103–04; Padilla Dep. at 60–63; Pallagi Dep. at 18–19.) But Padilla explained this at her deposition: "[W]hat I understood is that this was a past thing in the last year and they closed the chapter with the disciplinary action. So I was focusing again in the performance and the compliance of the objects that we set." (Padilla Dep. at 113.) As for Miller's review, Padilla testified that she thought that she had not included anyone's stakeholder feedback in their mid-year reviews. (Padilla Dep. at 112.) Miller offers nothing contrary. Moreover, Miller says nothing of the fact that Singer and Stover—both Caucasian males—received positive performance reviews from Padilla. (Miller Dep. at 158.)

Miller also argues disparate treatment based on the fact that Padilla "delevell[ed]" him during the April 2010 restructuring of Health Services while Stewart was not demoted for her involvement in the fuel-reimbursement issue. (Pl.'s Mot. at 20; Miller Dep. at 103–05.) As an initial matter, however, it is doubtful that a reasonable jury could find that GM did not demote Stewart. Miller stated that it was "confusing" what happened to Stewart and that Stewart shared "that she was going to be demoted but then they might bring her back to executive." (*Id.*) Indeed,

Miller acknowledged Stewart's "move" when he spoke to Padilla about the restructuring, "I . . . expressed something happened with [Stewart], I understand that move . . . ." (Miller Dep. at 105.) In contrast to Miller's somewhat ambiguous testimony, Padilla unequivocally testified that Stewart was demoted from the executive level. (Padilla Dep. at 62–63.) Moreover, Miller inconsistently argues that Stewart was not demoted because she retained her title, base pay, and the ability to use a company vehicle. (Pl.'s Resp. at 7.) Yet, after Miller's "delevelling," he retained his title and pay, and the "main change" Miller identified was that Singer was no longer his subordinate. (Miller Dep. at 99.)

But even if a jury were to agree with Miller that Stewart was not demoted, it would remain that Padilla's explanation for Miller's "delevelling" does not even hint at Miller's sex, race, or national origin: "I had to reorganize based on the conditions that we had at that moment in the company. . . . The conditions were bankruptcy, 46 percent less staff in our function, reorganization of manufacturing, and instability environment basically." (Padilla Dep. at 57.) Padilla specifically explained that Singer was elevated to Miller's level "[f]or two main reasons. One, bankruptcy and changes in the company, we were asked to simplify the structures. And second, because manufacturing had specifically asked to have each of the doctors with each one of the manufacturing managers." (Padilla Dep. at 70.)

In all then, Miller has not produced evidence permitting a reasonable jury to find that GM favored Stewart over him in responding to their behavior, conduct, or performance. Miller's reliance on GM's treatment of Stewart to demonstrate discriminatory motive is therefore misplaced.

Even less persuasively, Miller argues disparate treatment between himself and another African-American doctor at GM: Thomas Johnson. (*See* Pl.'s Resp. at 14–15.) In support, he

34

relies on his own and Bender's testimony. Miller testified, "Dr. Singer had come to me on more than one occasion where he stated that there was a double standard relative to how physicians at General Motors were treated if they were of . . . minority race or female." (Miller Dep. at 218.) Miller continued,

> And [Dr. Singer] being a white male, that was his impression, that he was not treated the same way either, that doctors such as Dr. Thomas Johnson who is African American male interacted with him. Dr. Singer was in group settings with Dr. Johnson where his conduct and attitude were very negative, were not consistent with what were the accepted standards of behavior, of teamwork, and Dr. Singer said he's not held accountable like the rest of us are.

(Miller Dep. at 218.) Miller also recalled that in 2009, he was performing a compensation review along with Stewart, and Lolita Fortenberry, an African-American female in GM's human-resources department. (Miller Dep. at 42, 78, 165–66; Pallagi Dep. at 23.) Miller noticed that although Johnson had been demoted to a plant medical director, he was still being compensated as a senior medical director. (Miller Dep. at 165–66.) When Miller brought this discrepancy to Stewart's attention, she stormed out of the meeting. (Miller Dep. at 166.) Miller subsequently raised the issue with Pallagi: "And Shawn [Pallagi] asked do we need to change this[?] I said no, we don't have to change it at this time. It was clearly different treatment going on for Dr. Johnson and for Dr. Stewart." (Miller Dep. at 166.) As for Bender's testimony, he recalled that Johnson had been slated for termination for harassing the nursing staff not long after he started as Corporate Medical Director in 2002. (Bender Dep. at 116, 118; Miller Dep. at 32.) But GM's Human Resources ultimately stopped the termination. (Bender Dep. at 119.) Two years later, Johnson allegedly had another incident with the nursing staff. (Bender Dep. at 118, 120–21.) Although the timing is unclear, Bender said he felt pressured by Human Resources and Johnson was promoted. (Bender Dep. at 117, 120.) Bender also recalled that when GM was downsizing,

35

GM did not permit him to ask Johnson to leave based on the reduction-in-force. (Bender Dep. at 123.)

These incidents involving Johnson do not support Miller's claim that GM terminated him in part because of his sex, race, or national origin. They took place years earlier and Miller has no evidence that any decisionmakers involved in his termination—including Rose, Padilla, and Richardson—were involved in the recounted incidents involving Johnson. *See Michigan Dep't of Civil Rights ex rel. Burnside v. Fashion Bug of Detroit*, 702 N.W.2d 154, 154 (Mich. 2005) (affirming because "it was not established that the ultimate decision maker harbored any racial animus toward [the plaintiff"); *cf. Krohn v. Sedgwick James of Michigan, Inc.*, 624 N.W.2d 212, 218 (Mich. Ct. App. 2001) ("The proffered evidence may range from an innocuous remark made by an employee with no involvement in the alleged adverse employment action long before such action takes place to a blatantly discriminatory comment made by a decisionmaker at the time the adverse action occurs. A trial court's determination of the probative value of a remark depends on where it falls on that continuum.").

The Court also notes that Miller admitted that, as far as he could recall, Padilla never made any comments about his—or anyone's—sex, race, or national origin. (Miller Dep. at 163.) Further, Miller's claim that he was terminated in part because of a protected characteristic is undermined by that fact that Richardson's investigation summary was based on interviews with several GM employees, including Cheng, Goddard, Stewart, and Stephanie Hughes (a nurse that worked under Miller). (*See* Def.'s Mot. at 252–58.) Yet Miller has cited no evidence that these individuals made the negative statements about Miller found in Richardson's report because of his sex, race, or national origin.

36

\* \* \*

In sum, Miller has offered explanations for most if not all of the conduct alleged by Padilla and recounted in Richardson's investigation summary. But a reasonable jury would not be persuaded that Miller appropriately handled the OSHA recordables issue or the hiring of a contract physician. And even if a reasonable jury were to conclude that GM had an insufficient basis for terminating Miller, Miller has not produced evidence permitting a reasonable jury to conclude that the GM decision-makers fabricated reasons to hide impermissible consideration of sex, race, or national origin. Summary judgment in favor of GM on Miller's discriminatory termination claim is thus warranted.

## C.

GM also seeks summary judgment in its favor on Count III of Miller's Complaint (*see* Def.'s Mot. at 23–24)—a claim that GM retaliated against Miller for engaging in conduct protected by the Elliott-Larsen Civil Rights Act (Compl. ¶¶ 43–51). The Court agrees with GM that Miller's retaliation claim fails as a matter of law.

The ELCRA precludes retaliation "against a person because the person has opposed a violation of" the Act. Mich. Comp. Laws § 37.2701. To establish a *prima facie* case of retaliation, Miller must show "'(1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.'" *Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 653 (Mich. 2005) (quoting *DeFlaviis v. Lord & Taylor, Inc.*, 566 N.W.2d 661 (Mich. Ct. App. 1997)).

GM primarily argues that the record does not permit a reasonable jury to find for Miller on the first element. (Def.'s Mot. at 23; Def.'s Reply at 5.) To engage in protected activity under the ELCRA, it suffices that an employee "rais[e] the spectre of a discrimination complaint." *McLemore v. Detroit Receiving Hosp. & Univ. Med. Ctr.*, 493 N.W.2d 441, 443 (Mich. Ct. App. 1992).

Miller says he engaged in protected activity when he spoke to Quattrone about his mid-year review. (*See* Pl.'s Resp. at 24.) According to Miller, Quattrone told Padilla "that what she did regarding [Miller's] expense report system was unfair and incorrect, and making Stan pay back that money is clearly not appropriate." (Miller Dep. at 154.) But even if that is what Quattrone told Padilla, this does not mean that Quattrone conveyed Miller's belief that her review was motivated by Miller's sex, race, or national origin. And Miller has cited no evidence permitting a reasonable jury to make this inference.

Miller also says that direct communications with Padilla constituted protected activity. (Pl.'s Resp. at 24.) He refers to emails sent on September 6 and September 15, 2010, wherein he asked Padilla to "have [her] feedback demonstrate consistency with [her] evaluation on others." (Pl.'s Resp. Ex. 19.) Although a reasonable jury could find that this statement expresses concern about disparate treatment, it could not make the further inference that the concern was over disparate treatment based on sex, race, or national origin. This is especially so given the positive mid-year reviews of Stover and Singer, both of whom are, like Miller, Caucasian males.

Miller additionally refers to his meeting with Padilla following her reorganization of Health Services. (Pl.'s Resp. at 24.) Miller testified, "I . . . expressed [to Padilla that] something happened with Sharon [Stewart], I understand that move, I expressed that I hadn't done anything but perform positively and supportively towards her, so it seemed like there was a difference in

38

treatment between the two of us. Hers for one reason, me for an unknown reason." (Miller Dep. at 105–06.) Again, a jury could find that Miller told Padilla that she had engaged in disparate treatment. But based on this testimony, a reasonable jury could not find that Miller claimed discrimination: disparate treatment based on race or sex.

Miller also asserts that he "unquestionably engaged in protected activity when he complained to Quattrone that Dr. Padilla was not qualified and was a minority hire[.]" (Pl.'s Resp. at 24.) Miller testified:

> [I] [e]xplained to John [Quattrone] so I recognize that [Padilla] is a minority female and this is clearly being done as a quota move and it's really unfortunate because it's—the most qualified person has not been selected and she was selected based on criteria other than objective criteria. John's comment was well, I don't know, she is from Latin America, I don't know if she really is a quota hire, I don't know. Obviously she is a minority female, but I don't know if a quota system is being used. But he was clearly made aware that that was my feelings . . . .

(Miller Dep. at 85, 87.)

Even if Miller's statements to Quattrone constitute protected activity under the ELCRA, the Court agrees with GM that Miller has no evidence that Quattrone ever relayed those statements to Rose, Padilla, or anyone else alleged to have taken adverse employment actions against Miller. (*See* Def.'s Mot. at 23–24.) Miller testified that he did not ask Quattrone to take any action with respect to his concerns, and, to his knowledge, Quattrone did not take it upon himself to convey Miller's statements. (Miller Dep. at 87–88.) As for Quattrone, Miller expressly testified that he is not claiming that Quattrone ever retaliated against him for stating that Padilla was promoted on account of her sex or race. (Miller Dep. at 90.)

In all, Miller either has not produced evidence permitting a reasonable jury to find that he "rais[ed] the spectre of a discrimination complaint," *McLemore*, 493 N.W.2d at 443, or, if he has, that those who allegedly took adverse actions against him were aware of that protected activity.

39

Accordingly, GM is entitled to summary judgment on Miller's claim of retaliation under the ELCRA.

## D.

In a footnote, GM points out that while Miller's Complaint does not "set forth a separate count of harassment," it does include "general allegations of a hostile work environment." (Def.'s Mot. at 24 n.6.) GM then (very briefly) argues that it is entitled to summary judgment on any hostile-work-environment claim because "there is no record evidence demonstrating that plaintiff's workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment, and that the harassment stemmed from gender- or race-based animus." (*Id.*)

In response, Miller argues that, as discussed above, "Over the course of many months, Dr. Padilla harassed, attacked, and lied about Dr. Miller on a regular basis." (*Id.*)

Miller's hostile-work-environment claim, if pled, fails for the same basic reason that undermines his discriminatory-termination claim. While Miller might persuade a reasonable jury that Padilla harassed him, Miller has not produced evidence permitting a jury to find that Padilla harassed him because of his sex, race, or national origin. Any hostile-work-environment claim therefore fails as a matter of law. *See Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 915 (Mich. 2000) (providing that "to establish a claim of hostile environment harassment, an employee must prove . . . by a preponderance of the evidence" that "the employee was subjected to communication or conduct on the basis of sex"); *Quinto v. Cross & Peters Co.*, 547 N.W.2d 314, 319 (Mich. 1996) (providing that an employee asserting a hostile-work-environment claim must

show that she "was subjected to communication or conduct on the basis of [her protected status]").

## IV.

For reasons set forth at length, GM's motion for summary judgment on Miller's claim that he was not promoted to Corporate Medical Director in part because of his sex, race, or national origin is DENIED. But Miller has failed to demonstrate a jury question on all of his other claims and so GM's motion is otherwise GRANTED.

SO ORDERED.


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  January 8, 2015


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 8, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson

41